UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EDDIE SPILLER,

       Plaintiff,                   Case No. 04-72815

vs.                                    HONORABLE ROBERT H. CLELAND
                                       HONORABLE STEVEN D. PEPE

CORRECTIONAL MEDICAL SERVICES,
DR. JOEL SHAVELL, and NURSE PATRICIA
GARNER-WILLIAMS,

       Defendants.
_____/

**REPORT AND RECOMMENDATION**

Plaintiff Eddie Spiller is a prisoner in the custody of the Michigan Department of Corrections ("MDOC"). Plaintiff filed a *pro se* civil rights complaint against Correctional Medical Services ("CMS") and several individual Defendants pursuant to 42 U.S.C. § 1983, alleging violations of his Eighth and Fourteenth Amendment. On May 26, 2005, Defendant Dr. Joel Shavell, D.O, filed a Motion For Summary Judgment (Dkt. # 47) and, after being granted an extension of time in which to answer, on July 25, 2005, Plaintiff responded with a Motion To Dismiss Defendant's Motion (Dkt. #54). All dispositive motions were referred to the undersigned for report and recommendation pursuant to 28 U.S.C. §§ 636(b)(1)(A),(B).

**I.**     **BACKGROUND**

    **A.**     **PLAINTIFF'S ALLEGATIONS**

Plaintiff is incarcerated at the Ryan Correctional Facility in Detroit, Michigan. Plaintiff alleges that, on October 22, 2002, he began experiencing sharp stomach pains, nausea, dizziness, fatigue and vomiting spells (Compl. ¶ 15). Later that evening, Nurse Garner called him to health

services to give him a pill for nausea and vomiting. The next day, Dr. Joel Shavell checked his temperature and pulse and examined his stomach before telling him his problem was psychological or bulimia (Compl. ¶ 16). Dr. Shavell told Plaintiff that he could not do testing "due to CMS".

On November 13, 2002, Plaintiff began vomiting blood and having stomach pains, nausea, fatigue and dizziness (Compl. ¶ 17). Plaintiff collapsed in the bathroom and was taken back to his cell. That day, he was admitted to Detroit Receiving Hospital (DRH) where tests showed he had a bleeding ulcer, swollen pancreas and massive blood loss. He was discharged on November 23, 2002, with one weeks worth of medication and given a follow-up appointment for December 2, 2002 (Compl. ¶ 18). CMS denied Plaintiff his follow-up visit and did not provide the follow-up care that the hospital offered.

On December 8, 2002, Plaintiff kited Health Services about not being seen (Compl. ¶ 21). On December 12, Plaintiff saw Dr. Shavell who changed the medications DHR had prescribed were substituted (Compl. ¶ 22). Plaintiff kited Health Services again on December 19 and 21 to report pain (Compl. ¶¶ 23-25).

Plaintiff was hospitalized from December 24 to December 29 "as a result of: 1) Substituted medications; 2) Denial of Special Diet; and 3) Delay/Denial in follow-up treatment/care by . . . CMS." (Compl. ¶ 26). On December 30, 2002, and January 5, 2003, Plaintiff kited Health Services about his medications (Compl. ¶¶ 28, 29).

At Plaintiff's January 13, 2003, appointment at the hospital, they "learned that the Plaintiff had not been receiving the medication they had prescribed" and ordered prescriptions from the hospital pharmacy, which CMS did not pick up (Compl. ¶¶ 30,31). From January until April, Plaintiff kited Health Services seven times concerning his medications (Compl. ¶¶ 32, 35, 39-41,

2

45-47). From June 29 until July 10, 2003, Plaintiff was hospitalized and had surgery to remove part of his stomach (Compl. ¶¶ 51-52). Plaintiff continued kiting Health Services and seeing Dr. Shavell (Compl. ¶¶ 53-55). He was hospitalized again from September 10 through September 13 (Compl. ¶¶ 56-57).

On September 18, 2003, Plaintiff blacked-out in his cell (Comp. ¶ 62). Plaintiff accuses Defendants of deliberate indifference, intentional denial of medical treatment, medical malpractice, and inhumane treatment based on the above incidents.

### B.     THE MEDICAL RECORDS

On April 19, 2002 and again on October 17, 2002, Plaintiff failed to show for his scheduled appointments with Dr. Shavell (Exhibit A[1], pp. 28, 29).

On October 22, 2002, Plaintiff complained of nausea and vomiting, for which he was offered Maalox and prescribed a liquid and soft diet. Plaintiff refused to accept the Maalox saying it did not help (Exhibit A, p. 28).

On October 23, 2002, Plaintiff was seen by Dr. Shavell with complaints of stomach pain for the past two and a half weeks (Exhibit A, p. 27). Dr. Shavell performed a physical examination.

On November 1 and 8, 2002, Plaintiff was seen by the nurse. On the 8th Plaintiff reported that his appetite was good (Exhibit A, p. 26). On November 11, 2002, Plaintiff failed to show for a call-out appointment scheduled with an on-site nurse.

On November 13, 2002, Plaintiff was seen by the nurse and reported decreased appetite. He was given Recourse, a dietary supplement. He later reported that he had vomited the Recourse and

---

[1] All references to "Exhibit" refer to those exhibits attached to Defendant's motion unless otherwise noted.

was experiencing severe stomach pain and inability to stand. A medical service provider at Duane Waters Hospital was contacted and instructed that Plaintiff be sent to the DRH emergency room for evaluation. Plaintiff was admitted to DRH on November 13, 2002, and discharged on November 23, 2002 (Exhibit A, p. 43). During his admission, Plaintiff underwent am Esophagogastroduodenoscopy (EGD), and was diagnosed with diffuse gastric atrophy and small pyloric channel ulcer with narrowing at the pylorus and duodenum (Exhibit A, p. 42). Plaintiff's November 23, 2002, discharge instructions from DRH, prescribed Protonix, Flagyl, Biaxin, Sulcralfate and ferrous sulfate, and provided instructions for a follow up exam and CT scan with IV contrast (Exhibit A, p. 43).

On November 25, 2002, Dr. Shavell requested authorization for the off-site follow up treatment prescribed in Plaintiff's discharge instructions, which was not approved and authorized until December 19, 2003 (Exhibit A, p. 47).

On December 12, 2002, Dr. Shavell prescribed Flagyl, Biaxin, and Ferrous Sulfate, and ordered a dietary consult (Exhibit A, p. 60). Dr. Shavell added Prevacid, Tetracycline and Pepto Bismol to Plaintiff's prescriptions the following day (Exhibit A, p. 59).

On December 23, 2002, Plaintiff was seen by Dr. Shavell complaining of black stools and sharp abdominal pain (Exhibit A, p. 24). Dr. Shavell ordered a CBC, Amylase and Lipase test (Exhibit A, p. 24, 59).

The following evening Plaintiff was reported looking ashen with complaints of stabbing abdominal pain and vomiting. At that time, he was sent to the DRH Emergency Room by Nurse Garner (Exhibit A, pp. 23-24, 58). On December 24, 2002, Plaintiff was again admitted to DRH and due to a pre-operative diagnosis of gastrointestinal bleeding, a repeat EGD was performed with a

biopsy (Exhibit A, pp. 44-45). Plaintiff was diagnosed with gastric atrophy, pyloric channel ulcer with narrowing, distal duodenal bulb ulcer on superior wall with some bleeding, and H. Pylori status positive. On December 29, 2002, Plaintiff returned to the Ryan Correctional Facility from DRH with prescriptions for Protonix, Carafate, Flagyl and Biaxin, dietary restrictions and instructions that Plaintiff was to be "rescoped" on January 13, 2002 (Compl. Exhibits, p. 52, attached hereto as Exhibit $1^2$). He denied any discomfort upon return (Exhibit A, p. 22).

Plaintiff was seen by Dr. Shavell on December 30, 2002, and reported doing well with no pain (Exhibit A, p. 22).

On January 3, 2003, Dr. Shavell ordered Tetracycline, Flagyl, and Pepto Bismol (Exhibit A, p. 57). On January 13, 2003, Plaintiff returned to DRH for his follow-up appointment (Dkt. # 54, Appendix A, pp. 4-5). The DRH physician wished to schedule another EGD for January 30, 2003, and faxed the request to Ryan Correction Facility. On January 16, 2003, Dr. Shavell ordered Biaxin, Flagyl, and Carafate for Plaintiff (Exhibit A, pp. 54, 56).

On January 20, 2003, Plaintiff complained of stomach pain but stated that he had not been vomiting and did not want to go to the hospital (Exhibit A, p. 21).

On January 22, 2003, Plaintiff saw Dr. Shavell and complained of an inability to eat and burning pain. Dr. Shavell examined Plaintiff, ordered laboratory and blood tests, and instructed Plaintiff to return to the clinic the next day (Exhibit A, pp. 21-19, 56). Plaintiff informed Dr. Shavell that "doctors told him that...depending on...findings they would send him to surgery for a resection."

---

[2]Plaintiff attached no exhibits to his amended complaint, but refers to those attached to his first complaint.

Plaintiff's January 23, 2003, abdominal exam was normal(Exhibit A, p. 18). He had broth twice the night before and two breakfasts that morning, and appeared better. Dr. Shavell ordered Plaintiff to continue his diet, observe his condition and be seen by a medical service provider every 2 weeks (Exhibit A, p. 55).

On January 24, 2003, Dr. Shavell postponed an endoscopy for four weeks to determine if abdominal pain would reoccur.

On January 27, 2003, Plaintiff spoke with the dietician and requested to be allowed a snack and/or Resource supplement because he found he was sometimes unable to eat at meal time.

On February 6, 2003, Dr. Shavell extended Plaintiff's medical service provider exams from every two weeks to every two months, with repeated blood work in 6 months (Exhibit A, p. 53).

When seen by Dr. Shavell on February 17, 2003, Plaintiff complained of cramping and gas pain for two weeks (Exhibit A, p. 17). After the physical exam showed no guarding or rigidity, good bowel sounds, ability to lie flat, and no signs of distress, Dr. Shavell prescribed Lactaid to be taken with meals, but his impression was that the bowel gas required no other treatment (Exhibit A, p. 55).

On March 6, 2003, Dr. Shavell examined Plaintiff who was complaining of inability to eat (Exhibit A, p. 15). Dr. Shavell noted continued anemia and iron deficiency. He again increased Plaintiff's medical service provider review to twice a month. On March 7, 2003, Dr. Shavell requested authorization for a GI consult and repeat EGD, which CMS denied (Exhibit A, p. 63).

On March 21, 2003, Plaintiff complained that he had vomited. He was provided a bag to collect any recurrent emesis so that the heath care staff could analyze it for blood.

On April 25, 2003, Dr. Shavell ordered ferrous sulfate and Aciphex for Plaintiff (Exhibit A,

p. 53).

When seen by Dr. Shavell on May 2, 2003, Plaintiff had continued complaints of gas and abdomen pain (Exhibit A, p. 11). Dr. Shavell ordered blood tests and noted the complaints of gas and diarrhea were not as persistent and were calming down.

On June 12, 2003, Plaintiff was seen by the dietician and reported feeling better. He had gained weight and the dietician did not renew his mechanical soft diet restriction.

Plaintiff was seen by Nurse Bastin at the Ryan Correctional Facility on June 28 or 29, 2003, with complaints of vomiting and stomach ache (Exhibit A, p. 3). He was given Maalox and placed on the list to be seen by a physician. Then, found laying on bathroom floor after repeated episode of vomiting, he was transferred to DRH Emergency Room where he later underwent surgery (Exhibit A, p. 4). Plaintiff returned to the Ryan Correctional Facility on July 10, 2003.

Plaintiff was seen by Dr. Shavell the next day on July 11, 2003 (Exhibit A, p. 5). He reported feeling good, but asked for a walker because he could not stand up.

On July 21, 2003, Plaintiff reported complaints of nausea for the first time since his surgery. In response, Dr. Shavell ordered a liquid diet with Resource, a reevaluation and a dietician consult (Exhibit A, p. 51).

On August 4, 2003, a registered dietician gave Plaintiff some information regarding diet restrictions to alleviate his symptoms (Exhibit A, p. 6). Dr. Shavell ordered an anti-reflux diet for 3 months starting (Exhibit A, p. 50).

Plaintiff was seen by Dr. Shavell on August 20, 2003, at approximately 12:20 p.m. He had gained 6 pounds and reported no vomiting or pain. At approximately 2:30 p.m. that day he reported to the nurse that he had experienced a bowel movement which contained blood (Exhibit A, p. 7).

7

Dr. Shavell was consulted and he prescribed hemorrhoidal suppositories. Plaintiff was informed to notify health care if symptoms persisted. Dr. Shavell also ordered a RBC panel and scheduled Plaintiff to be seen by a medical service provider every two months (Exhibit A, p. 50).   On September 8, 2003, Dr. Shavell ordered that Plaintiff's weight be monitored on a weekly basis for 4 weeks.

On September 10, 2003, Plaintiff was seen by nursing and by Dr. Shavell for complaints of severe pain in his abdomen, with reports of vomiting and loss of appetite. Dr. Shavell's impression was possible small bowel obstruction and he ordered Plaintiff to be sent to the emergency room. (Exhibit A, p. 8). Plaintiff was once again admitted to DRH and underwent another EGD with a diagnosis of antral atrophy, bile gastritis, large patent pylorus status post pyloroplasty, and a duodenal ulcer (Exhibit A, pp. 34-36).

Plaintiff was discharged from DRH in good condition on September 13, 2003, with prescriptions for Biaxin, Flagyl, omeprazole and sucralfate for his peptic ulcer disease and instructions to return in one week (Exhibit A, pp. 37-38). He was able to return to a regular diet with no restrictions. On September 15, 2003, Dr. Shavell ordered Flagyl, Aciphex, Doxycycline, and sucralfate for Plaintiff (Exhibit A, p. 48).

Plaintiff was seen by Dr. Shavell on September 15, 2003, who reported Plaintiff not doing well since his return from the hospital, and was again vomiting (Exhibit A, p. 9). Plaintiff told Dr. Shavell that he had been told in the hospital that they found a new ulcer and that the medications he had previously been given had not worked. Dr. Shavell then indicates that he "reviewed the formulary from the hospital ...."

On September 16, 2003, Dr. Shavell ordered Plaintiff back to the emergency room at DRH

8

due to his continuous stomach pain and vomiting (Exhibit A, p. 10). Plaintiff was seen in the ER at DRH, which noted he was taking Protonix, Flagyl, Biaxin and Carafate. They discharged him the same day with a diagnosis of acute gastritis secondary to his medications (Exhibit A, pp. 39-41). He was given discharge instructions to take medications with food and to add Maalox. On September 16, 2003, Dr. Shavell saw Plaintiff at the Ryan Correctional Facility. He noted that Plaintiff needed thorough evaluation and was possibly discharged prematurely by DRH. He recommended that he be sent back (Exhibit A, p. 10). Plaintiff was sent to the Duane Waters Hospital (DWH) Emergency Room, where Plaintiff reported that he had not taken his medication with food as instructed, had in fact not eaten for the last 36 hours and had vomited that morning after taking his Protonix (Exhibit A, p. 31). Plaintiff reported taking Biaxin, Flagyl, Carafate and Protonix. He noted that he had started on Biaxin recently and had been experiencing nausea and vomiting since the day after starting that drug. He was able to rest comfortably after being given a shot of Tigan and intravenous hydration. His prescriptions were reviewed and he was advised not to have any potassium substitutes. His discharge plan included changing Biaxin to doxycycline, changing Protonix to Aciphex and continuing Flagyl and Carafate. Plaintiff was to have a clear liquid diet as tolerated with ice chips upon his return, and ordered to be seen by the medical service provider the following morning (Exhibit A, p. 49).

On September 17, 2003, Dr. Shavell noted that Plaintiff was stable but not doing well (Exhibit A, p. 2). Dr. Shavell noted that Plaintiff had been prescribed new medications (*id.*) and prescribed Flagyl, Aciphex, doxycycline and Sucralfate (Exhibit A, p. 48).

On September 18, 2003, a nurse was called when Plaintiff was found "supine in middle of floor". She asked him to open his eyes but he squinted and tightened them, and refused to move his

arms and legs. He was able to sit up, but refused to move. He was brought to health care, where he explained that he had a phobia about taking medication because it caused him to vomit.

On September 23, 2003, Plaintiff was doing better and was moved back into general population (Exhibit A, p. 1). On September 24, 2003, Plaintiff was seen by Dr. Shavell and complained of vomiting, but reported that he was able to keep his liquid diet down. He weighed 137 pounds, was ordered to remain on a liquid diet and follow up as necessary.

## II.   ANALYSIS

### A.   Summary Judgment Standard of Review

Defendant Dr. Shavell has filed a motion for summary judgment under Rule 56(b). Under Fed. R. Civ. P. 56, summary judgment is to be entered if the moving party demonstrates there is no genuine issue as to any material fact. The Supreme Court has interpreted this to mean that summary judgment should be entered if the evidence is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). *See also Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985). In resolving a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party. *See Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986); *Bouldis v. United States Suzuki Motor Corp.*, 711 F.2d 1319 (6th Cir. 1983). But as the Supreme Court wrote in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986):

> T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case

> necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Moreover, when a motion for summary judgment is filed, the adverse party may not merely rely "upon the mere allegations or denials of the adverse party's pleading, but . . . by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

### B.     **Eighth Amendment Deliberate Indifference**

#### 1.     *Legal Standard*

The Supreme Court has recognized the responsibility of the courts "to scrutinize claims of cruel and unusual confinement." *Rhodes v. Chapman*, 452 U.S. 337, 352 (1981). Included as a type of conduct that violates the Eighth Amendment is a prison official's deliberate indifference to a prisoner's serious medical needs. *See, e.g.*, *Estelle v. Gamble*, 429 U.S. 97 (1976); *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976). To succeed on a claim of deliberate indifference, plaintiff must satisfy two elements, an objective one and a subjective one. He must show he had a serious medical need, and he must show that defendant, being aware of that need, acted with deliberate indifference to it. *Wilson v. Seiter*, 501 U.S. 298, 300 (1991).

A medical need is "serious" if it has been diagnosed by a physician as requiring treatment or is so obvious that a lay person would easily recognize the necessity for a doctor's attention. *Monmouth County Correctional Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987), *cert. denied*, 486 U.S. 1006 (1988). A serious ailment requires immediate attention or is potentially life-threatening:

> A "serious" medical need exists if the failure to treat a prisoner's condition could

result in further significant injury or the "unnecessary and wanton infliction of pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (citation omitted). To establish a serious medical need, it is not necessary for plaintiff to show that he suffered an actual, tangible physical injury from the defendants' alleged actions. *Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir. 1991). The fact that a plaintiff endured unnecessary pain and suffering is sufficient for an Eighth Amendment claim. *Id.* In *Westlake v. Lucas*, the Sixth Circuit stated that "a prisoner who is needlessly allowed to suffer pain when relief is readily available does have a cause of action against those whose deliberate indifference is the cause of his suffering." *Westlake*, 537 F.2d at 859.

"Deliberate indifference" has been variously defined by the federal courts that have considered prisoners' Eighth Amendment claims, but all agree that it is more than mere negligence and less than actual intent. In *Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970 (1994), the Supreme Court explained the meaning of "deliberate indifference."

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; *the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference*. . . . Eighth Amendment suits against prison officials must satisfy a "subjective" requirement . . . .

511 U.S. at 836-37, 114 S. Ct. at 1978-1979 (emphasis supplied). *See also Estelle v. Gamble,* 429 U.S. at 105-106 (a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim under the Eighth Amendment; "medical malpractice does not become a constitutional violation merely because the victim is a prisoner"); *Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir. 1995) (deliberate indifference is the equivalent of "criminal recklessness, which requires a subjective showing that the defendant was aware of the risk of harm"); *Gibson v. Foltz*, 963 F.2d 851, 853 (6th Cir. 1992) ("[o]bduracy or wantonness, not inadvertence or good faith

error, characterizes deliberate indifference"). Accordingly, even "gross negligence" by prison officials is insufficient to support a deliberate indifference claim. *Ribble v. Lucky*, 817 F. Supp. 653, 655 (E.D. Mich. 1993).

As noted in *Estelle*, "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106. Delay in access to medical attention can violate the Eighth Amendment when it is "tantamount to 'unnecessary and wanton infliction of pain.'" *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d 1176, 1187 (6th Cir. 1994) (quoting *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir.) (per curiam), *cert. denied*, 496 U.S. 928, 110 S. Ct. 2624 (1990)).

### 2.     *Claims against Defendant Dr. Shavell*

The seriousness of Plaintiff's medical condition is not in dispute. Therefore he has meet the objective requirement of the deliberate indifference standard. Plaintiff claims that Dr. Shavell's deliberate indifference stems from his decision to deviate from DRH's discharge instructions by prescribing "substitute" medication and not maintaining follow-up care as scheduled, which allegedly necessitated surgical intervention and re-hospitalization (Dkt. # 54, pp. 2-3). To meet the subjective component, the evidence must permit a reasonable jury to find that Defendant Dr. Shavell possessed a "sufficiently culpable state of mind." *Estate of Carter*, 408 F.3d 305, 312 (6th Cir. 2005). To do that, Plaintiff must show that Dr. Shavell subjectively perceived facts from which to infer substantial risk to him, that he did in fact draw the inference, and that he then disregarded that risk in prescribing substitute medications and providing follow-up care as he did. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir.2001)(citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

As stated above, "Deliberate indifference 'entails something more than mere negligence,' but can be 'satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895-96 (6th Cir.2004)(quoting *Farmer*, 511 U.S. at 835).

The facts indicate that Plaintiff was released from DHR on November 23, 2002, with instructions to return on December 2 for a follow-up CT scan, and with prescriptions for Protenix, Flagyl, Biaxin, Sulcralfate and Ferrous Sulfate (Exhibit A, p. 43).  Plaintiff indicates in his complaint that he was released with enough medication to last him one week (Compl. ¶ 18).  Dr. Shavell requested Plaintiff's follow up visit through CMS on November 25 (Exhibit A, p. 47) and on December 12 and 13 prescribed Flagyl, Biaxin, Ferrous Sulfate, Prevacid, Tetracycline and Pepto Bismol, and ordered a dietary consult for Plaintiff (Exhibit A, pp. 59-60).  On December 23, 2002, Plaintiff began complaining of black stool and abdominal pain (Exhibit A, p. 24).  Dr. Shavell responded by ordering tests, x-rays and blood work.  The following evening Plaintiff symptoms became worse and he was sent to the DHR emergency room (Exhibit A, pp. 23-24, 58).  Plaintiff underwent surgery at DHR which Plaintiff says was caused by Dr. Shavell's substitution of medications and failure to provide follow-up care as instructed by DRH.

DHR prescribed Protonix and Sulcralfate, and Dr. Shavell substituted tetracycline and Prevacid.  According to the Physician's Desk Reference, both Protonix and Prevacid are medicines used to inhibit gastric acid secretion for the short-term treatment of gastroesphogeal reflux ( 2004 *Physicians Desk Reference*, pp. 3209, 3479).  Sulcralfate is an aluminum complex which used in the healing of duodenal ulcers (*Id.* at. 731-32).

The medicine regime prescribed by Dr. Shavell, tetracycline together with Flagyl

14

(metronidazole) and pepto bismol, is described by the Merk Manual as one of the first and most widely studied treatment regimens for *H. pylori* (excerpt attached hereto as Exhibit 2). Apparently, patients that complete greater than 60% of the regimen for 2 weeks will cure 80% of infections (*id.*). Therefore, there is not sufficient evidence to permit a reasonable jury to find that Dr. Shavell perceived a risk to Plaintiff in prescribing these medications and, as such, the action cannot support a claim for deliberate indifference.

As for the follow-up care, Dr. Shavell followed CMS's requirements in arranging to have Plaintiff return to DHR for his CT scan. In the interim, Dr. Shavell treated Plaintiff with medication and a dietary consult, and Plaintiff had access to the Ryan Correctional Facility medical staff as needed. The kites Plaintiff filed regarding follow-up care prior to his December surgery are summarized as follows:

December 3, 2002 - saying he had not been seen by dietician or doctor yet since return from hospital, requesting special diet, and requesting information regarding his follow-up appointment with DRH hospital which was supposed to have been on the 2nd (Compl. Exhibits, p. 48). In this kite Plaintiff explains that he was expecting to go back to DRH to find out if he would need surgery.

December 8, 2002 - saying he had still not been seen by the doctor, was experiencing stomach pain and acid reflux, needed medication refill and wanted information regarding the status of CMS approval for return visit to DHR (Compl. Exhibits, p. 49).

December 19, 2002 - reporting stomach cramps and spasms (Compl. Exhibits, p. 50).

December 21, 2002 - reporting black stool and stomach pain (Compl. Exhibits, p. 51).

The last kite resulted in Plaintiff being put on the list to see Dr. Shavell on December 23, 2002. At which time, as stated above, Dr. Shavell ordered tests, x-rays and blood work (Exhibit A,

15

p. 24, 59). None of these kites are signed as having been processed by Dr. Shavell. Further they do not allege a need for emergency care, but follow-up visits. It seems clear that when Plaintiff did communicate urgent symptoms he was seen and treated. Therefore, Dr. Shavell's course of treatment – medication, ordering a dietary consult, requesting Plaintiff's follow-up DRH appointment through CMS and ordering tests and blood work upon hearing that Plaintiff was experiencing continuing symptoms – cannot provide a reasonable jury with sufficient evidence to support a claim that he recognized a risk to Plaintiff and deliberately ignored such.

In sum, Plaintiff has been unable to support his case with anything other than his allegations that Dr. Shavell was at fault for Plaintiff's December 2002 surgery. These allegations are insufficient to overcome the medical records which indicate that Dr. Shavell's treatment of Plaintiff could not be found to constitute deliberate indifference. Therefore, because Plaintiff is unable to set forth specific facts showing that there is a genuine issue for trial it is recommended that Defendant Dr. Shavell's motion for summary disposition be granted.

### III.  RECOMMENDATION

For the reasons stated above, IT IS RECOMMENDED that Defendant's motion for summary judgment be GRANTED.

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not

preserve all objections that party might have to this Report and Recommendation. *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.

*Note:* any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than ten days after service an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.


Dated: January 9, 2006                                s/Steven D. Pepe
Ann Arbor, Michigan                                   United States Magistrate Judge




Certificate of Service

I hereby certify that a copy of the above was served upon the attorneys and/or parties of record by electronic means or U. S. Mail on January 09, 2006.

s/William J. Barkholz
Courtroom Deputy Clerk

17